## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 22-cv-22594-BLOOM/Torres

MOVIE PROP RENTALS LLC
and MIAMI PROP RENTALS LLC

      Plaintiffs,

v.

THE KINGDOM OF GOD GLOBAL
CHURCH and JOSHUA MEDIA
MINISTRIES INTERNATIONAL

      Defendants.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** is before the Court following the conclusion of a seven-day bench trial conducted on February 27, 2024, February 28, 2024, March 18, 2024, March 20, 2024, April 15, 2024, April 16, 2024, and June 5, 2024. Following the presentation of testimony and other evidence, the Court permitted the parties to file closing arguments and proposed findings of fact and conclusions of law. Plaintiffs Movie Prop Rentals LLC and Miami Prop Rentals LLC ("Plaintiffs") filed their admitted exhibits, ECF No. [238], and Defendants The Kingdom of God Global Church and Joshua Media Ministries International ("Defendants") filed their admitted exhibits. ECF No. [239]. The Court has carefully reviewed the parties' evidentiary submissions, the trial transcripts, the record in this case, the applicable law, and is otherwise fully advised. The Court makes the following findings of fact and conclusions of law.

### I.  PROCEDURAL BACKGROUND

This action arises from Defendants' purported failure to timely pay Plaintiffs the agreed price for a unique stage prop Plaintiffs were commissioned to produce for Defendants. Plaintiff

initiated this action against Defendants on June 10, 2022, in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida. ECF No. [1-2]. Defendants thereafter removed this action to federal court, and on September 9, 2022, Plaintiffs filed their Amended Complaint. *See* ECF Nos. [1], [12]. Plaintiffs' Amended Complaint asserts six claims against Defendants: Damages under an Account Stated (Count I); Damages under an Open Account (Count II); Unjust Enrichment (Count III); Contract Implied in Fact (Count IV); Contract Implied in Law (Count V); and Declaratory Judgment (Count VI). *See generally* ECF No. [12]. On September 23, 2022, Defendants filed an Answer and Counterclaim, asserting five claims against Plaintiffs: Breach of Oral Contract (Count I); Unjust Enrichment in the Alternative (Count II); Breach of the Implied Duty of Good Faith and Fair Dealing (Count III); Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count IV); and a Temporary, Preliminary, and Permanent Injunctive Relief (Count V). *See* ECF No. [14].

During the litigation, Plaintiffs filed a Motion for Summary Judgment on Defendants' Counterclaims. ECF No. [102]. The Court granted the Motion as to Defendants' Counterclaims Counts II-V (Unjust Enrichment, Breach of the Implied Duty of Good Faith and Fair Dealing, Violation of FDUTPA, and Injunction claims) but denied Plaintiffs' Motion to the extent it sought judgment on Defendants' claim for Breach of Oral Contract (Count I).  ECF No. [136].[1]

The case thereafter proceeded to trial. Although Defendants originally demanded a jury trial, the parties eventually stipulated to a bench trial. ECF No. [141]. Over the course of the seven-day trial, the parties introduced several exhibits and testimony, including transcripts of the

---

[1] As the prevailing parties on Defendants' FDUPTA Counterclaim, Plaintiffs filed a Motion for Attorneys' Fees, ECF No. [189]. The Court referred the Motion for Attorneys' Fees to the Magistrate Judge, who issued a Report and Recommendation (R&R") recommending that Plaintiffs' requests for attorneys' fees be granted while their requests for cost be denied. The Court then entered an order adopting the R&R and awarded Plaintiff an attorney fee award of $108,744.50 against Defendants.

depositions of Paul Hendrix ("Depo Hendrix"), Richard Sierra ("Depo Sierra"), Defendants' designated representative Joseph Busch ("Depo Busch"), Ashley Nicole ("Depo Nicole") and Kane Smith ("Depo Smith").

## II.    FINDINGS OF FACT

Plaintiffs are a Miami movie and film production businesses renting, leasing, manufacturing, and selling movie sets and stage props. *See* ECF No. [155]. Defendant Kingdom of God Global Church ("Kingdom of God") "is a Christian[-]based global outreach movement committed to establishing God's Kingdom through the proclamation and demonstration of the Gospel." ECF No. [240] at 1. Defendant Joshua Media Ministries International ("Joshua Media") is a Christian non-profit ministry. *See* ECF No. [233] at 111.

Beginning in January 2020, Defendants were planning a large-scale outreach event originally intended to be held in July 2020 at the Amway Arena in Orlando, Florida ("Amway Arena Event"). ECF No. [233] at 114. In preparation for the Amway Arena Event, Defendants engaged Plaintiffs to design and manufacture a specialized modular Roman-Corinthian "Coliseum" stage prop ("Stage Prop") to be used at the Amway Arena Event and other events thereafter. ECF No. [136] at 3; ECF No. [103] at ¶ 3. Based upon conceptual drawings and plans, the parties entered into an agreement in February 2020 for Plaintiffs to fabricate the Stage Prop in exchange for Defendants paying a total sum of approximately $679,345.00. ECF No. [150] at ¶ 5. However, that was not the final contract, as the parties continued to discuss changes to the conceptual design and the Stage Prop.

In March 2020, the parties agreed to have Plaintiffs add additional material to the Stage Prop and for Plaintiffs to provide additional services for modulization of the set for transporting to other arenas, among other items and services. *Id.* at ¶ 6. The additional material and services

substantially increased the final agreed-upon price from $679,345.00 to approximately $1,250,000.00. *Id.* Accordingly, the final agreement (hereinafter the "Contract") provided that, in exchange for $1,252,968.00 paid in a series of four installments, Plaintiffs would create the Stage Prop to be 136 feet wide, 49 feet high, and 38 feet deep, fabricated within 3-1/2 months (i.e., before the July 2020 Outreach Event), and Plaintiffs would assist with installing and disassembling the Stage Prop at the Amway Arena Event. *See* ECF No. [238-8]; ECF No. [230] at 10. Because Defendants were either unable or unwilling to pay the full cost up front, the total price for the Contract was to be paid in non-refundable[2] installments intended to finance Plaintiffs' fabrication of the Stage Prop. ECF No. [230] at 30; ECF No. [238-52] at 68; ECF No. [234] at 69; ECF No. [103] at ¶ 5; ECF No. [114] at ¶ 5. Accordingly, Plaintiffs relied upon Defendants to make all the agreed installment payments in a timely fashion. ECF No. [230] at 32.

The agreed installment structure in the Contract required Defendants to pay Plaintiffs three installments of $375,890.80: one payment in April, one in the beginning of May, one in the beginning of June 2020, and then a fourth and final payment of $125,296.80 upon the installation of the Stage Prop at the Amway Arena Event in July. *See* ECF No. [238-9]; ECF No. [230] at 26.[3] After the final $125,296.80 payment, Defendants would own and possess the Stage Prop for any later uses. ECF No. [240] at 6. However, Defendants made only the following payments within the originally agreed-upon timeline:

| March 31, 2020 | $150,000 (1st half down payment) |
| April 22, 2020 | $100,020.00 (2nd half down payment) |

---

[2] The Terms and Conditions section of the first invoice, which Defendants agreed to, expressly stated "Custom orders are non-refundable." ECF No. [238-9].

[3] While the final payment due upon installation was to be $125,296.80, the cost of the installation and disassembly for the July Amway Arena Event was to be $101,800.00. *See* Pls. Tr. Ex. 21-B.

| May 6, 2020 | $ 60,000.00 |
|---|---|
| **Total** | **$310,020.00** |

Despite knowing that Plaintiffs were dependent on their agreed financing to fund the project, Defendants paid less than 25% of the contract price for the Stage Prop by the July 9, 2020, deadline. ECF No. [214]. The record supports there was no confusion as to the amounts owed under the Contract or the importance of Defendants making timely payments. Over the course of those 3 ½ months, Plaintiffs sent numerous invoices, regularly communicated to Defendants the amounts owed, and emphasized the need for continued funding.

On March 25, 2020, Plaintiffs emailed the first of several invoices to Defendants' main principals, David Taylor and Michelle Brannon, who acknowledged its receipt.[4] The invoice listed a total cost of $1,252,968.00 for the Stage Prop as well as a $250,000.00 down payment. ECF No. [98-4] at 1; ECF No. [136] at 4; ECF No. [238-9]. The invoice also indicated that $125,890.80 was "due by the end of April [2020]," and that the additional two $375,890.80 payments were due at the beginning of May and June 2020, respectively. ECF No. [238-9]. The invoice further provided that a "remaining 10%" of the Oral Contract, or $125,296.80, was due upon installation of the Stage Prop at the Amway Arena Event in July 2020. ECF No. [238-9]; ECF No. [136]. [5]

---

[4] While Taylor was the head decision-maker, Brannon was designated as Defendants' primary contact for matters related to funding, the budget, invoices, and payments.

[5] Plaintiffs further provided Defendants with an undated invoice titled "ART BUDGET Arena Stage." ECF No. [98-8] at 4-5. This budget was the final budget for the Stage Prop, which Jerry Blohm, Plaintiffs' owner, created on March 25, 2020. The final budget divided Plaintiffs' expenses into two sections: one for labor and one for materials. The final budget anticipated that the total labor costs for the entire build would be $404,075.00. Those costs included all labor for the build, plus the labor for installation and disassembly at the Amway Arena Event. The final budget listed the total cost for materials and supplies at $858,593.00, listed as "PRODUCTION EXPENSES TOTAL."

Defendants were satisfied with the invoice, and on March 31, 2020, they made an initial partial down payment of $150,000.00. ECF No. [214].

On April 22, 2020, at Defendants' request, Plaintiffs prepared a second invoice featuring the same total cost of $1,252,968.00, but with a slightly adjusted payment schedule. ECF No. [98-5] at 1; ECF No. [238-10].[6] The invoice provided for the $150,000.00 partial down payment, a $100,000.00 "additional down[] payment[,]" and the same installment payments of $375,890.80 due at the beginning of May and June 2020, along with the $125,296.80 due upon installation. ECF No. [98-5] at 1; ECF No. [238-10]. While Defendants made the final $100,000.00 partial down payment on April 22, 2020, Defendants' funding soon began to go awry.

On April 23, 2020, Brannon sent a text message requesting a new invoice. ECF No. [230] at 45. That same day, Blohm sent Brannon the updated invoice in an email titled, "New Invoice." ECF No. [98-6] at 1. The email noted that Plaintiffs "received the funds [for the down payment] yesterday," and attached the third invoice. *Id.*[7] The invoice still listed a total cost of $1,252,968.00 and indicated that the remaining $125,890.80 payment for April was "due in 5 days to continue" as well as the same $375,890.80 payments due at the beginning of May and June 2020, respectively. *Id.* The invoice also included the same final installation payment of $125,296.80. *Id.*

On April 28, 2020, Blohm sent Brannon another email, titled "Budget." ECF No. [98-7]. Blohm noted that he "reviewed [his] numbers[,] [and] at the moment[,] we are as [of] today[,] at $255k[.]" ECF No. [238-14]. During the trial, Blohm clarified that what the email meant was that Plaintiffs had already incurred $255,000.00 in expenses but had only received $250,000.00 from Defendants. ECF No. [230] at 60. According to Blohm, the Defendants understood what the email

---

[6] Brannon acknowledged receipt of the email containing the second invoice. ECF No. [230] at 45-46.

[7] Brannon also confirmed receipt of the third invoice. *See* ECF No. [230] at 51.

meant because Blohm also reiterated this information to Brannon over the phone. *Id.* Furthermore, not only were Plaintiffs forced to incur $5,000.00 more than they had been paid as a result of Defendants' delayed payments, but Blohm also made clear that in just a couple of days, Plaintiffs would incur approximately $30,000.00 to $40,000.00 in additional payroll expenses related to the Stage Prop project. *Id.* at 60-61. Accordingly, Blohm reiterated that "our [C]ontract with you was $375k per month," and to continue, Plaintiffs would need the remaining $125,890 of April's payment and the May payment by "Friday 1 May 2020." ECF No. [238-14]. To highlight the significance of any delay, Blohm's email warned that "this is a critical time in the fabrication process" and that "we will be lucky to make [the Prop] come in at" the total agreed budget of $1,252,968.00.[8] *Id.* Blohm explained that his email was intended to put Defendants on "notice that they weren't paying timely and it was going to affect the outcome of the mission." ECF No. [230] at 61.

Blohm also attached a fourth invoice to his email with a total budget of $1,252,968.00 listing deposits of $150,000.00 labeled "3/31/202[0] non-refundable," $100,020.00 labeled "4/22/2020 non-refundable," and $60,000.00 labeled "5/6/2020 non-refundable." *Id.* at 2. The fourth invoice provided for the three payments of $375,890.80 due April 1, 2020, and the beginning of May and June 2020, respectively, as well as the $125,296.80 due "[u]pon final install." *Id.* The April 1 payment included a note explaining that this payment is "to start project[.]" *Id.*[9]

---

[8] At trial, Blohm clarified that his email meant to convey that "without funding[,] we're not going to be able to round the corner and get this done. Fabrication, you know, is dependent—solely dependent on funding. Without money, we can't get these things done."

[9] Each of the invoices Plaintiffs issued to Defendants during the project was consistent with the agreed final budget price of $1,252,968.00. As the evidentiary record reflects, each of the invoices also continued to bill or referred to the $375,890.80 monthly installment payment due at the beginning of April, May, and June 2020, and indicated the payments were not refundable.

Despite Defendants failing to send the needed funding, Plaintiffs continued to work apace, including ordering needed materials, and hiring and using additional labor, through the end of April and into early May 2020. ECF No. [231] at 50-51, 67, 69. However, without the necessary funds to continue the project, Plaintiffs were forced to slow their work on the Stage Prop. ECF No. [230] at 79-80. While Defendants sent an additional $60,000.00 on May 6, 2020, that payment failed to cover the remaining $125,890.00 balance for April, and the May payment that was also past due. ECF No. [214]; ECF No. [238-13]. Nevertheless, in hopes that Defendants would provide the necessary funding, Plaintiffs quickly requested that Defendants pay the remaining $65,870.00 for the April installment and the $375,890.80 for the past due May installment. ECF No. [230] at 59. Plaintiffs advised Defendants that their continued failure to make their payments in a timely fashion was jeopardizing the entire fabrication of the Stage Prop project. *Id.* at 55. Although Plaintiffs were concerned about Defendants' ability to fulfill the agreement, Plaintiffs resumed their rapid construction pace through mid-May 2020 in an effort to complete construction of the Stage Prop by the mid-July 2020 target. ECF No. [231] at 66-67.

Between May 4, 2020, and May 9, 2020, Blohm and Taylor exchanged a series of text messages about the project, and, at one point, Blohm told Taylor "We should probably speak today before we pack all this stuff up." ECF No. [230] at 91-92; ECF No. [238-25]. A few days later, on May 15, 2020, Blohm also sent an email to Taylor and Brannon explaining that Blohm had reached out to Brannon several times regarding Defendants' failure to pay, but Brannon had not provided a meaningful update in nearly two weeks. ECF No. [238-24]. Due to the lack of communication and funding, Blohm informed Defendants that Plaintiffs would be winding down a few works in progress but would otherwise cease construction on the Stage Prop. *See id.* While Blohm recommended finishing the fabrication process on the agreed timeline while they still had

momentum and extra personnel, Defendants did not agree, and the lack of continued funding made it impossible. ECF No. [230] at 84-86; ECF No. [238-24].[10] Blohm noted that the majority of the Stage Prop was built, and Plaintiffs were still willing and able to complete the build by mid-July 2020 if Defendants were willing to pay the agreed funding amounts. ECF No. [230] at 84-85, 87-88. Blohm also warned that stopping and starting fabrication as funds rolled in would cost Defendants even more money than they had originally agreed. *Id.* at 84-87.

Shortly after they began to shut down construction, Plaintiffs were made aware that the Amway Arena Event had been postponed, but Plaintiffs received no substantive communications about how Defendants wanted to handle the project moving forward. ECF No. [230] at 97-98.[11]

In early July 2020, Defendants resumed communications with Plaintiffs and requested that the fabrication continue, albeit at a much slower pace. ECF No. [230] at 101. Plaintiffs initially objected to the modified proposal, explaining that a slower pace would be a bad idea because Plaintiffs had carpenters, fabricators, extra labor, and a lot of materials on hand, which would be lost with any delay. *Id.* at 74. Plaintiffs also warned Defendants that if they operated at a slower pace, it would result in significantly increased costs such that Plaintiffs would not be able to complete the job on budget. *Id.* at 100. While Plaintiffs preferred resuming the construction at an expedited pace with full timely payments, Defendants refused, as they were unwilling to continue with their accelerated construction funding. *Id.* at 100-102. Instead, Defendants maintained they were only willing to offer $70,000.00 a month moving forward. *Id.* at 105.

Although Plaintiffs preferred not to amend the timeline or payment schedule for the project, Plaintiffs were forced into an untenable position due to Defendants' failure to make timely

---

[10] Blohm also communicated this information to Taylor and Brannon on several phone calls.

[11] The Court notes that the postponement of the July 2020 Amway Arena Event was not a basis for stopping payments or otherwise excusing performance under the parties' contract, given that Stage Prop was specifically designed in a modular format to allow for future use at later events.

payments. As of July 2023, Plaintiffs had incurred approximately $50,000.00 more in expenses than they had received from Defendants and had begun to turn away other business due to the Stage Prop consuming a large portion of Plaintiffs' premises. *Id.* at 76-77. Accordingly, Plaintiffs continued working on the project again in mid-July 2020, to mitigate damages and in hopes that Defendants would continue funding the project, albeit at a significantly reduced monthly rate.

While Plaintiffs began working on the Stage Prop again, after two months, Defendants failed to fulfill their promise to pay the $70,000.00 monthly installments. *See* ECF No. [214]. Instead, Defendants intermittently made partial payments over the course of one year. *Id.* Consequently, because Plaintiffs could not count on funds to arrive at regular intervals, and given the reduced amount, Plaintiffs reluctantly continued to work on the Stage Prop only as money came in, but at an even slower pace than previously anticipated. ECF No. [230] at 82, 86. The delays were further compounded by Covid 19-related hyperinflation and other supply problems that would have otherwise been avoided had Defendants had timely made their installment payments. *Id.* at 87-88. Accordingly, the delayed timeline also resulted in a substantial increase in costs for materials and labor.

After May 11, 2021, Defendants' payments stopped altogether. ECF No. [214]. Plaintiffs communicated that continued payments were necessary to complete construction, but Defendants refused to make any additional payments. While Plaintiffs continued working through the summer and early fall of 2021 to complete certain aspects of the Stage Prop, by November 2021, Plaintiffs ceased construction due to the lack of funding. ECF No. [230] at 120. Because Plaintiffs were no longer working on the Stage Prop, they stored the partially constructed prop in a portion of its indoor fabrication area, an outdoor 53 foot semi-trailer container, its 40 foot and 55 foot storage

trailers, and purchased two more trailers to safely pack and store the remaining components of the Stage Prop. *See id.* at 86-87.

Taylor eventually called Plaintiffs in early February 2022, requesting that Plaintiffs recommence construction of the Stage Prop. ECF No. [231] at 102-103. Up to that point, Defendants had not inspected the Stage Prop and did not communicate any complaints about the status of the project. Rather, Defendants continually praised Plaintiffs for their work throughout the construction process and even after Defendants stopped making payments in early May 2021. ECF Nos. [238-36], [238-34]. Once communication between Plaintiffs and Defendants resumed in February 2022, Defendants sent individuals to visit Plaintiffs' premises and inspect the Stage Prop. While Defendants insist they decided to cease funding only after February 2022, Defendants failed to make any payment toward the project in over nine months. ECF No. [214]. Because Defendants were unwilling to agree to any increases in the budget, let alone fulfill the payment obligations they had already agreed to, Plaintiffs brought the instant action seeking damages.

## III.    CONCLUSIONS OF LAW

### A.    Count I—Account Stated

"An account stated is a firmly established claim in Florida." *First Union Disc. Brokerage Servs., Inc. v. Milos*, 997 F.2d 835, 841 (11th Cir. 1993) (citing *Martyn v. Amold*, 36 Fla. 446, 18 So. 791, 793-94 (1895) (additional citations omitted)). "For an account stated to exist as a matter of law, there must be an agreement between the parties that a certain balance is correct and due and an express or implicit promise to pay this balance." *James Dar, LLC v. OJ Commerce.com, Inc.*, No. 21-61901-CIV, 2022 WL 18463415, at *3 (S.D. Fla. Dec. 22, 2022) (quoting *Merrill-Stevens Dry Dock Co. v. Corniche Exp.*, 400 So. 2d 1286, 1286 (Fla. 3d DCA 1981)).[12] An account

---

[12] The Florida Standard Jury Instructions set out the elements for an account stated claim as follows:

stated need not be based on any written instrument, nor must the parties have even entered into a formal written agreement. *See Bushnell v. Portfolio Recovery Assocs., LLC*, 255 So. 3d 473, 477 (Fla. 2d DCA 2018). "An account stated comes into being when a creditor periodically bills a debtor for a certain amount, which amount is not objected to within a reasonable time." *Dudas v. Dade County*, 385 So. 2d 1144 (Fla. 3d DCA 1980); *see Robert C. Malt & Co. v. Kelly Tractor Co.*, 518 So. 2d 991, 992 (Fla. 4th DCA 1988).

Evidence of a plaintiff's periodic billing in the ordinary course of business without objection from the debtor creates a rebuttable presumption of assent to the accuracy and correctness of the amount stated and establishes a *prima facie* case. *See Idearc Media Corp. v. Premier Limousine, LLC*, No. 8:08-cv-1695-JSM-MAP, 2009 WL 482293, at *3 (M.D. Fla. Feb. 25, 2009) (citing *Nants v. F.D.I.C.*, 864 F. Supp. 1211, 1219-1220 (S.D. Fla. 1994)); *see also Home Health Servs. of Sarasota, Inc. v. McQuay–Garrett, Sullivan & Co.*, 462 So. 2d 605, 606 (Fla. 2d DCA 1985); *Robert C. Malt & Co.*, 518 So. 2d at 992.[13] The presumption of accuracy and correctness may only be "overcome by proof of fraud, mistake, or error." *Martyn*, 36 Fla. 446, 18 So. at 793-94; *see also First Union Disc. Brokerage Servs., Inc. v. Milos*, 744 F. Supp. 1145, 1152

---

1.   Plaintiff and Defendant had transactions between them;

2.   Plaintiff and Defendant agreed upon the balance due or Plaintiff rendered a statement to Defendant and Defendant failed to object within a reasonable time to a statement of its account;

3.   Defendant expressly or implicitly promised to pay Plaintiff the amount set forth in the statement; and

4.   Defendant has not paid Plaintiff any of the amount owed under the account.

*In re Standard Jury Instructions--Cont. & Bus. Cases*, 116 So. 3d 284, 331 (Fla. 2013)

[13] "The presumption of correctness which attaches in an account stated stems from the statements themselves." *T.T. Int'l Co., Ltd v. BMP Int'l, Inc.*, No. 8:19-CV-2044-CEH-AEP, 2022 WL 971950, at *10 (M.D. Fla. Mar. 31, 2022) (quoting *Nants*, 864 F. Supp. at 1221).

(S.D. Fla. 1990) (citing *Home Health Servs. of Sarasota, Inc.*, 462 So. 2d at 606). "The burden of establishing those defenses is on the party asserting them, and unless that party carries the burden, the presumptive correctness of the account stated becomes conclusive." *Home Health Servs. of Sarasota, Inc.*, 462 So. 2d at 606 (citing *Gendzier v. Bielecki*, 97 So. 2d 604, 608 (Fla. 1957)).

There is no dispute between the parties that Defendants agreed to pay Plaintiffs $1,252,968.00 for the fabrication and installation of the Stage Prop and that Defendants repeatedly affirmed their assent to that amount over the course of several years. Plaintiffs also established the existence of an account stated for that debt obligation by introducing the invoices submitted to Defendants reflecting the total amount owed for the Stage Prop, together with the amount owed for each of the agreed monthly installments. Therefore, Plaintiffs' invoices are presumptively accurate and must be deemed conclusively correct absent evidence that they were the product of fraud, error, or mistake. *See Idearc Media Corp.*, 2009 WL 482293, at *3; *Martyn*, 36 Fla. 446, 18 So. at 793-94.

Defendants do not argue that any such equitable defense is applicable here. Instead, Defendants maintain that Plaintiffs have not established their account stated claim because they have failed to prove the existence of an "agreement between persons who have had previous business transactions." ECF No. [240] at 22. According to Defendants, the trial testimony establishes that the parties were meeting for the first time for this business deal and that they had no previous transactions before entering into the agreement to build the Stage Prop. *See id.* at 22-23. Therefore, because a prior business relationship did not exist, Defendants insist that the Plaintiffs' account stated claim must fail.

While Defendants are correct that "an account stated has been defined to be an agreement between persons who have had previous transactions," Defendants misconstrue the import of the

prior transaction requirement. *Farley v. Chase Bank, U.S.A., N.A.*, 37 So. 3d 936, 937 (Fla. 4th DCA 2010) (quoting *Martyn*, 18 So. at 793). The prior transaction requirement merely necessitates that a business transaction give rise to the pre-existing obligation prior to the accounting. *See e.g., Architectonics, Inc. v. Salem-Am. Ventures, Inc.*, 350 So. 2d 581, 585 (Fla. 2d DCA 1977); *Everett v. Webb Furniture Co.*, 124 So. 278, 279 (1929) (explaining that the prior transaction requirement is necessary for an account stated claim to ensure that a liability existed at the time the account was presented and the plaintiff was not simply trying to create a liability by sending an invoice for goods or services that was never agreed upon). There is no requirement that a previous unrelated business relationship exist between the parties. Accordingly, the invoices Plaintiffs sent to Defendants comport with the prior dealings requirement, as those invoices reflect the liabilities (i.e., the installment payments) Defendants previously agreed to incur each month. Once the liabilities accrued, the invoices were sent, and Defendants failed to object that the amount invoiced was owed, a valid account stated was formed. Since Plaintiffs have successfully proven their claim, the Court must determine what the appropriate damages based upon the evidence.

Pursuant to the parties' Contract and the invoices submitted, Defendants were to pay Plaintiffs the full $1,252,968.00, less the installation installment fee for the Stage Prop ($125,296.80) by the beginning of June 2020.[14] To date, Defendants have only paid $783,280.00 of their $1,127,671.20 liability.[15] Therefore, Defendants have an outstanding account stated balance of $344,391.20, which Plaintiffs are now entitled to recover.

---

[14] Because the Plaintiffs never installed the Stage Prop for Defendants, Defendants did not incur a liability for the installation. As such, they cannot recover the $125,296.80 under their account stated claim.

[15] *See supra* note 14 for explanation as to why Defendants only incurred $1,127,671.20 in liabilities despite entering into a contract for $1,252,968.00.

While Plaintiffs also seek to recover lost profits, storage costs, and the costs for certain labor and supplies, damages for such costs are unavailable under Plaintiffs' account stated action. As noted above, to be liable for an account stated, there must be an agreement that a certain balance is past due. *James Dar, LLC*, 2022 WL 18463415, at *3. Although those additional costs were likely foreseeable, there is no evidence in the record that Defendants agreed to incur these additional costs or accepted that those costs constituted liabilities owed to Plaintiffs.[16] Accordingly, such damages are unavailable pursuant to Count I. While the outcome might have been different had Plaintiffs brought a breach of contract claim, no such claim was asserted in the Amended Complaint or any amendment during the course of the litigation and the Court may only award damages based on the causes of action asserted. As such, Plaintiffs are only entitled to $344,391.20 in damages under Count I.

## B. Count II—Open Account

"The concept of an open account is difficult to define as there is little Florida case law on the subject." *City of Winter Haven v. Cleveland Indians Baseball Co., LP*, No. 809-CV-00190-T-17EAJ, 2009 WL 1107670, at *1 (M.D. Fla. Apr. 22, 2009) (citing *Robert W. Gottfried, Inc. v. Cole*, 454 So. 2d 695, 696 (Fla. 4th DCA, 1984)). However, from what can be gleaned from the limited precedent, "[a]n open account is 'an unsettled debt arising from items of work and labor, goods sold and delivered with the expectation of further transactions subject to future settlement and adjustment.'" *Morse, LLC v. United Wisconsin Life Ins. Co.*, 356 F. Supp. 2d 1296, 1299 (S.D. Fla. 2005) (quoting *Cole*, 454 So. 2d at 696).[17] "The three essential elements of an action based

---

[16] Plaintiffs fail to point to any invoices or other evidence that Defendants assented, either explicitly or implicitly, to these additional costs. Defendants insisted on moving forward with the project and never consented to moving the Stage Prop into storage, nor did they agree to an increase in cost for the project.

[17] An open account is typically "one which is based upon a connected series of transactions, which has no break or interruption." 1 Am. Jur. 2d Accounts and Accounting § 4.

on an open account claim are: (1) that a sales contract existed between the creditor and debtor; (2) that the amount claimed by the creditor represents either the agreed on sales price or the reasonable value of the goods delivered; and (3) that the goods were actually delivered." *Idearc Media Corp. v. Premier Limousine, LLC*, No. 8:08-CV-1695-T-30MAP, 2009 WL 482293, at *2 (M.D. Fla. Feb. 25, 2009) (citing *Alderman Interior Sys., Inc. v. First Nat'l-Heller Factors, Inc.*, 376 So. 2d 22, 24 (Fla. 2d DCA 1979); *Evans v. Delro Indus., Inc.*, 509 So.2d 1262, 1263 (Fla. 1st DCA 1987)). "Additionally, in order to state a valid claim on an open account, the claimant must attach an 'itemized' copy of the account." *Id.* (citing *H & H Design Builders, Inc. v. Travelers' Indemnity Co.*, 639 So. 2d 697, 700 (Fla. 5th DCA 1994) (additional citations omitted).

The Court finds that Plaintiffs have not proven their open account claim. Plaintiffs have failed to establish that the goods in question were "actually delivered" to Defendants, as the Stage Prop was never completed and is still in Plaintiffs' possession. Accordingly, the Court finds in favor of Defendants on Count II of the Amended Complaint.

### C. Count III—Unjust Enrichment

Unjust enrichment is an equitable claim that is only available where an express contract concerning the same subject matter does not exist. *See Diamond "S" Dev. Corp. v. Mercantile Bank*, 989 So. 2d 696, 697 (Fla. 1st DCA 2008) ("[A] plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter."). There is no dispute that an express contract exists between the parties. *See* ECF No. [240] at 19. The Contract provided that, in exchange for Plaintiffs' fabrication and installment of the Stage Prop at the Amway Arena Event in July 2020, Defendants would pay Plaintiffs a total of $1,252,968.00 in a series of four installments over the course of 3 ½ months. *See* ECF No. [238-8]; ECF No. [230] at 10. Given that Plaintiffs' unjust enrichment claim concerns the same subject

matter, *see* ECF No. [12] at 10-11, Plaintiffs are unable to establish an unjust enrichment claim under the circumstances. Consequently, the Court finds in favor of the Defendants as to Count III.

### Count IV—Contract Implied in Fact

"Like an express contract, to show a breach of an implied-in-fact contract under Florida law, a plaintiff must establish a valid contract, material breach, and damages." *Vanguard Plastic Surgery, PLLC v. Cigna Health & Life Ins. Co.*, No. 0:22-CV-61086-WPD, 2023 WL 2168513, at *4 (S.D. Fla. Jan. 18, 2023) (citing *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir. 2012) ("Florida courts use breach of contract analysis to evaluate claims of breach of contract implied in fact."); *Beck v. Lazard Feres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999) (providing the elements of breach of contract)). Accordingly, just as in an ordinary breach of contract claim, "a plaintiff must show the existence of a valid contract by alleging: (1) an offer; (2) acceptance of the offer; (3) consideration; and (4) sufficient specification of the essential terms." *Id.* (citing *Senter v. JPMorgan Chase Bank, N.A.*, 810 F. Supp. 2d 1339, 1345 (S.D. Fla. 2011)).

What is unique about a breach of contract implied in fact claim is that it "imposes liability, in the absence of an express agreement,[18] 'based on a tacit promise, one that is inferred in whole or in part from the parties' conduct, not solely from their words.'" *F.H. Paschen, S.N. Nielsen & Assocs. LLC v. B&B Site Dev., Inc.*, 311 So. 3d 39, 48 (Fla. 4th DCA 2021) (quoting *Commerce P'ship 8098 Ltd. P'ship*, 695 So. 2d at 387). [T]he law will not recognize an implied-in-fact contract where an express contract exists[.]" *Baron v. Osman*, 39 So. 3d 449, 451 (Fla. 5th DCA 2010) (citing *Quayside Assocs., Ltd. v. Triefler*, 506 So. 2d 6, 7 (Fla. 3d DCA 1987)); *Fulton v. Brancato*, 189 So. 3d 967, 969 (Fla. 4th DCA 2016).

---

[18] "Where an agreement is arrived at by words, oral or written, the contract is said to be 'express.'" *Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co., Inc.*, 695 So. 2d 383, 387 (Fla. 4th DCA 1997).

As the Court previously determined in its unjust enrichment analysis, a valid express contract exists between the parties regarding the fabrication and installation of the Stage Prop. Consequently, the Court may not recognize an implied contract concerning the same subject matter. And while "Florida courts have 'long recognized that an implied contract may arise out of an express contract where a [party] performs extras not covered by the original contract,'" the Court does not find that Defendants implicitly agreed to pay any additional costs for labor, materials, or storage of the Stage Prop beyond what was set out in the original Contract. *Rhythm & Hues, LLC v. Nature's Lawn Care, Inc.*, 368 So. 3d 12, 14 (Fla. 4th DCA 2023) (quoting *F.H. Paschen, S.N. Nielsen & Assocs. v. B&B Site Dev., Inc.*, 311 So. 3d 39, 49 (Fla. 4th DCA 2021) and citing *S. Bell Tel. & Tel. Co. v. Acme Elec. Contractors, Inc.*, 418 So. 2d 1187, 1188-89 (Fla. 4th DCA 1982)). Indeed, when Plaintiffs notified Defendants that they would need to place the Stage Prop in storage, Defendants expressly rejected the proposal and insisted that Plaintiffs move forward with the project. ECF No. [233] at 164-65; ECF No. [238-25]. Furthermore, although Plaintiffs were forced to accept Defendants' modified payment schedule in July 2020, thereby delaying fabrication and pushing the project into a period of Covid-19 hyperinflation, there is insufficient evidence that Defendants implicitly agreed to accept any anticipated increases in the cost of completing the Stage Prop merely because they modified the payment schedule. Simply because the costs were likely to increase did not necessarily mean that Defendants were to be the ones to shoulder the overages. Accordingly, the Court does not find a contract implied in fact existed, and as such, the Court finds in favor of Defendants as to Count IV.

### D.  Count V—Contract Implied in Law

Similar to a claim for unjust enrichment, a plaintiff cannot pursue an equitable remedy based on a theory of contract implied in law where an express contract exists concerning the same

subject matter. *See Fulton*, 189 So. 3d at 969; *Berry v. Budget Rent A Car Sys., Inc.*, 497 F. Supp. 2d 1361, 1369 (S.D. Fla. 2007) ("[A] quasi-contractual claim fails upon a showing that an express contract exist[s]."). Once again, because there was an express contract between the parties concerning the fabrication and installation of the Stage Prop, Plaintiffs' claim for a breach of a contract implied in law necessarily fails.[19]

### E.   Count VI—Declaratory Judgment

The Court must now address Plaintiffs' final claim—the declaratory judgment claim. In their action for declaratory judgment, Plaintiffs seek to have the Court issue a judgment affirming their entitlement to the damages requested in the previous five Counts. However, "[i]t is well-settled that equitable relief is available only in the absence of an adequate remedy at law." *Cent. Magnetic Imaging Open MRI of Plantation, Ltd. v. State Farm Mut. Auto. Ins. Co.*, 789 F. Supp. 2d 1311, 1317 (S.D. Fla. 2011) (quoting *SME Racks, Inc. v. Sistemas Mecanicos Para, Electronica, S.A.*, 243 Fed. Appx. 502, 503 (11th Cir. 2007)). Here, there is not only an adequate remedy at law, but the Court has awarded Plaintiffs a legal remedy in the form of damages. Accordingly, Plaintiffs' request for a declaration regarding their entitlement to damages is duplicative as such relief would serve no additional purpose given the Court's determination on the merits of the previous Counts.[20] Plaintiffs request for declaratory relief involves only past conduct which has already ripened into other claims in this case and therefore, a declaratory judgment regarding those same issues would be superfluous. *See Evanston Ins. Co. v. Sheet Metal*

---

[19] As stated in the Court's breach of contract implied in fact analysis, the Court does not find that Defendants ever agreed to the additional extra costs they incurred, such as the increased costs for labor, materials, and storage fees. As such, there is no implied contract that might be considered separate and apart from the original oral Contract either.

[20] To the extent that Plaintiffs are seeking a declaratory judgment that they did not breach the contract, that issue is resolved by the Court's resolution of Defendants' breach of contract claim.

*Masters, Inc.*, No. 3:23CV5257-TKW-ZCB, 2023 WL 9234590, at *3 (N.D. Fla. Dec. 26, 2023) (citing *S.G. Associates of Miami, Inc. v. W. World Ins. Co.*, 2021 WL 4502304, at *1 (S.D. Fla. Sept. 30, 2021)). Therefore, given the duplicative nature of the declaratory judgment claim, the Court finds in favor of Defendants as to Count VI. *See Persaud Properties FL Investments, LLC v. Town of Fort Myers Beach, Florida*, 593 F. Supp. 3d 1129, 1144 (M.D. Fla. 2022) ("Declaratory relief is purely discretionary, and courts have the power to dismiss a claim for declaratory relief where it is duplicative of claims asserted in a lawsuit."); *see also Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1330 (11th Cir. 2005) (explaining that the Declaratory Judgment Act "gives the federal courts competence to make a declaration of rights; it does not impose a duty to do so"). Having resolved Plaintiffs' claims, the Court turns to Defendants' Counterclaim.

### F. Defendants' Counterclaim for Breach of Oral Contract (Count I)

In their Counterclaim, Defendants assert a breach of oral contract claim against Plaintiffs. *See* ECF No. [14].[21] "For a breach of contract claim, Florida law requires a claimant to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *Friedman v. N.Y. Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. 4th DCA 2008)). Additionally, "in order to maintain an action for breach of contract, a claimant must also prove performance of its obligations under the contract or a legal excuse for its nonperformance." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. 2d DCA 2006).

"To constitute a vital or material breach, a defendant's non-performance must be such as to go to the essence of the contract." *Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1313 (11th Cir. 2019) (quoting *Sublime, Inc. v. Boardman's Inc.*, 849 So. 2d 470, 471 (Fla. 4th

---

[21] Defendants' other counterclaims were dismissed on summary judgment. *See* ECF No. [136] at 21.

DCA 2003)). Accordingly, the breach must be the type "that would discharge the injured party from further contractual duty[.]" *Atlanta Jet v. Liberty Aircraft Servs., LLC*, 866 So. 2d 148, 150 (Fla. 4th DCA 2004) (citing *Beefy Trail, Inc. v. Beefy King Int'l., Inc.*, 267 So. 2d 853, 857 (Fla. 4th DCA 1972)). However, "not every breach permits the nonbreaching party to cease performance." *Eclectic Synergy, LLC v. Seredin*, 347 So. 3d 27, 29 (Fla. 4th DCA 2022). "Trivial noncompliance" or a "failure to perform some minor part of [the party's] contractual duty cannot be classified as a material or vital breach." *Atlanta Jet*, 866 So. 2d at 150.

The parties agree they entered an express oral contract. ECF No. [240] at 4-5; ECF No. [241] at 6. The Contract provided that Defendants would pay Plaintiffs $1,252,968.00 in a series of four installments over the course of 3 ½ months to fabricate and install the Stage Prop at the Amway Arena Event in July 2020. *See* ECF No. [238-8]; ECF No. [230] at 10. There is no dispute that Plaintiffs failed to fulfill their obligation under the Contract, as they never completed the construction and fabrication of the Stage Prop, nor did they ever install the Stage Prop. While such conduct may typically amount to a material breach, under Florida law, when parties exchange promises to perform, a prior "material breach by one party excuses performance by the other party." *Mattocks v. Black Ent. Television LLC*, 43 F. Supp. 3d 1311, 1319 (S.D. Fla. 2014) (citing *Indem. Ins. Corp. of DC. v. Caylao*, 130 So. 3d 783, 786 (Fla. 1st DCA 2014); *Toyota Tsusho Am., Inc. v. Crittenden*, 732 So. 2d 472, 477 (Fla. 5th DCA 1999). Therefore, to determine whether Plaintiffs materially breached the Contract by failing to complete the Stage Prop, the Court must first determine if Defendants materially breached the Contract such that Plaintiffs were discharged of contractual liability or Plaintiffs' performance was otherwise excused.

Under the terms of the Contract, Defendants agreed to pay Plaintiffs a total of $1,252,968.00 for the Stage Prop, which was to be paid out to Plaintiffs in a series of four

installments: $375,890.80 in April 2020, $375,890.80 at the beginning of May 2020, $375,890.80

at the beginning of June 2020, and $125,296.80 upon installation of the Stage Prop, which was

expected to be installed at the Amway Arena Event in mid-July 2020. ECF No. [241] at 6. At no

point did Defendants ever comply with the Contract's payment schedule. Indeed, by the end of the

installment schedule, Defendants had failed to even fulfill their April 2020 obligation, let alone

the payments for May and June. *See* ECF No. [214]. The decision not to pay in a timely fashion

was unilateral. The record reflects that Defendants never sought consent nor negotiated with

Plaintiffs prior to delaying their payments. The first time Defendants tried to adjust the timing and

amount of their installments, nearly every payment deadline had since expired.[22] *See* ECF No.

[238-9]; ECF No. [230] at 78. Accordingly, Defendants clearly breached the Contract well before

Plaintiffs.[23] The only question then is whether Defendants' breach was so material to the Contract

such that Plaintiffs' failure to adequately perform was excusable.

When it comes to an obligation to pay, the "failure to make a payment on time does not

constitute per se a material breach of contract. Rather, to constitute a material breach, the late

payment must occur where time is of the essence." *Centurion Air Cargo, Inc. v. United Parcel

Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005). "Time is considered to be of the essence when:

(1) the agreement explicitly so specifies; (2) it may be determined from the subject matter of the

contract; (3) treating time as non-essential would produce a hardship; or (4) notice has been given

to the defaulting party requesting performance within a reasonable time." *Bookworld Trade, Inc.*

---

[22] By early July 2020, the only payment that had not come due was the payment for the installation of the Stage Prop.

[23] While Defendants contend that Plaintiffs breached the Contract by not providing weekly updates as agreed, the record reflects that Plaintiffs sent regular updates through early May 2020. It was only after Defendants stopped funding the project that Plaintiffs stopped providing the regular updates. *See e.g.*, ECF No. [238-24] (providing Defendants a weekly update for the week of May 11, 2020).

*v. Daughters of St. Paul, Inc.*, 532 F. Supp. 2d 1350, 1358 (M.D. Fla. 2007) (citing *Centurion Air Cargo, Inc.*, 420 F.3d at 1151).

The record and testimony reflect that time was of the essence for payment under the Contract.[24] While there is no evidence that the parties explicitly stated that time was of the essence in their agreement, the nature of the Contract made it clear that timely payment was essential. Plaintiffs explained to Defendants that the primary reason they needed to be paid in installments over the course of the fabrication process, as opposed to a lump sum upon completion, was that the installments were necessary to finance the project. ECF No. [114] at ¶ 5; ECF No. [238-48] at 68-69. As small businesses, Plaintiffs did not have the means to purchase the necessary materials or hire adequate labor without reliable funding from Defendants. *See* ECF No. [230] at 104. Consequently, any significant lapse in funding greatly inhibited Plaintiffs' ability to complete the project on time and on budget. *Id.*

The need for timely and consistent funding was not only clear based on the nature of the Contract, but Plaintiffs repeatedly warned Defendants during the project that a failure to make timely payments would prevent them from working, increase the ultimate cost of fabrication, and significantly delay the project's completion. *See e.g.,* ECF No. [238-24]; ECF No. [238-26]. Accordingly, given that time was of the essence in the parties' Contract, Defendants' unilateral

---

[24] Although Defendants contend that "the Parties always agreed to operate on a relaxed payment schedule," there is no persuasive evidence to support such an assertion. ECF No. [240] at 7. Plaintiffs' invoices, emails, and messages to Defendants reflect that Plaintiffs consistently insisted upon receiving timely payment and only accepted delayed payments and subsequent modifications to the payment schedule once it became clear that acceptance of these modified terms would be the only means of mitigating the damages Plaintiffs had already incurred. For instance, the purported agreement to adjust the payment schedule to $70,000.00 a month was not agreed to until after Defendants had already missed all of their $375,890.80 scheduled installments and had ceased communications with Plaintiffs for over a month. *See* ECF No. [230] at 99-101. Therefore, to suggest that Plaintiffs' acceptance of any delayed funds or a subsequent modified payment schedule reflects an agreement to operate on a relaxed payment schedule from the very beginning is disingenuous at best.

decision to make indiscriminate and untimely payments at their leisure constituted a material breach that excused Plaintiffs' performance and discharged them of liability under the Contract.[25] As such, the Court finds in favor of Plaintiffs as to Defendants' Counterclaim for breach of the oral contract claim.

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.   Defendants are liable to Plaintiffs as to **Count I** of the Amended Complaint, ECF No. [12], in the amount of **$344,391.20**.

2.  The Court finds in favor of Defendants as to **Counts II-VI** of the Amended Complaint, ECF No. [12].

3.  The Court finds in favor of Plaintiffs as to **Count I** of Defendants' Counterclaim, ECF No. [14].

4.  Following the Court's Order Adopting the Report and Recommendation of Attorneys' Fees in favor of Plaintiffs as prevailing parties under Defendants' Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") claim, *see* ECF No. [227], the Court awards Plaintiffs **$108,477.50 in attorneys' fees** against Defendants.

5.  Final Judgment will be entered by separate Order, in accordance with Rule 58 of the Federal Rules of Civil Procedure.

---

[25] In arguing that Plaintiffs breached the Contract, Defendants also try to make much ado about how Plaintiffs spent the installment payments they received, arguing that Plaintiffs' purported misappropriation of funds constituted a material breach, thereby excusing any further payments from Defendants. However, Plaintiffs' use of funds is irrelevant given that Plaintiffs were under no obligation under the Contract to spend the funds received in a particular way. Even if certain funds were reasonably expected to pay for materials and labor for the Stage Prop, portions of Defendants' installment payments were intended to serve as part of Plaintiffs' profits, which could be used for any purpose. Therefore, the Court rejects Defendants' contention that Plaintiffs materially breached the Contract simply because they may have utilized proceeds from Defendants for items other than the fabrication of the Stage Prop.

**DONE AND ORDERED** in Chambers at Miami, Florida, on January 3, 2026.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record